OHIO TRANSP. CO. et al. v. DAVIDSON S. S. CO.

DAVIDSON S. S. CO. v. OHIO TRANSP. CO. et al.

(Circuit Court of Appeals, Seventh Circuit.   October 2, 1906.)

Nos. 1,220, 1,232.

**1. SHIPPING—PROCEEDING FOR LIMITATION OF LIABILITY—SURRENDER OF VESSEL.**

Rev. St. §§ 4283, 4285 [U. S. Comp. St. 1901, pp. 2943, 2944], clearly give the owner of any vessel the right to personal exemption from liability for any damage occasioned by such vessel without his privity or knowledge by transferring her and her pending freight to a trustee to be appointed by a court of admiralty, and although admiralty rule 54, prescribing the procedure under said sections, permits him at his option to retain the vessel by having her appraised and paying her appraised value, and pending freight into court or giving a stipulation therefor, he still has the right before an appraisement made on his petition has been accepted, or any order has been made thereon, to dismiss that part of his petition, and, instead, to ask for the appointment of a trustee to whom he may transfer the vessel and her freight.

[Ed. Note.—Limitation of liability of vessel owner, see note to The Longfellow, 45 C. C. A. 387.]

**2. COLLISION—STEAM VESSELS MEETING.**

Evidence considered, and *held* to support a finding that a collision between two steamers in Lake Erie, off the mouth of Detroit river, was due solely to the fault of one in failing to conform to a passing agreement and for her negligent navigation.

Appeals from the District Court of the United States for the Eastern District of Wisconsin.

See 131 Fed. 373.

F. H. Canfield and Chas. E. Kremer, for Davidson Steamship Company.

William E. Church, Frank S. Masten, and Harvey G. Goulder, for Ohio Transp. Company and others.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge.   About 9 o'clock in the night of November 20, 1903, the steamer Sacramento, bound from Erie to Milwaukee, and the steamer Gladstone, bound from Manitowoc to Buffalo, collided on Lake Erie, near the Detroit River Light.   The Sacramento, practically uninjured, continued on to Milwaukee.   The Gladstone sank; and her cargo of about 132,000 bushels of barley and oats was abandoned to the underwriters.

On November 27, 1903, the Davidson Company, owner of the Sacramento, in the court below filed its petition to limit its liability to the value of the vessel and her pending freight, and asked that appraisers be appointed.   On December 2d appraisers reported the value of the vessel to be $65,000 and her pending freight $1,678.67.   While the original petition stood, the court never confirmed, nor was asked to confirm, this appraisement; never ordered, nor was asked to order, the payment of the appraised value into court or the giving of a stipulation with sureties for the payment thereof.   On December 7th the

Davidson Company, by leave of court, filed a supplemental petition, praying that the Sacramento be sold and the proceeds put into the registry to abide further orders. By leave of court on April 4, 1904, an amendment to the petition was filed, asking that the vessel and her pending freight might be transferred to a trustee to be appointed by the court. Objections were filed by the Ohio Company, as owner of the Gladstone and as trustee of cargo underwriters, and by four underwriters for themselves. In support thereof affidavits were presented to the effect that in April, 1904, vessels of the Sacramento type were less valuable than in November and December, 1903, by reason of higher rates for marine insurance, increased cost of operation, and poor outlook for the season's business. On the hearing of the supplemental petition and the amendment to the petition, the court, on May 21, 1904, ordered that the Sacramento and her pending freight be transferred to a commissioner named. Subsequently the vessel was sold for $26,000.

On issues framed respecting the responsibility for the collision and the amount of damages occasioned thereby, the court found and adjudged that the Sacramento was solely at fault, but without the privity or knowledge of the Davidson Company, and that the Gladstone and her cargo were damaged to the extent of $79,530. The final decree provided that the liability of the Davidson Company be limited to the freight and the value of the Sacramento as established by the sale, and distributed the freight and net proceeds of the sale ratably among the claimants.

The Ohio Company and the insurers challenge the correctness of that part of the decree which limits the liability of the Davidson Company, while the latter charges that the court erred in applying the freight and proceeds of sale toward the payment of the damages.

1. Section 4283 of the Revised Statutes [U. S. Comp. St. 1901, p. 2943] provides that the liability of the owner of a vessel for any damage occasioned without his privity or knowledge "shall in no case exceed the amount or value of the interest of such owner in such vessel and her freight then pending." By section 4284 [U. S. Comp. St. 1901, p. 2943], whenever the whole value is not sufficient to compensate all who are damnified, they shall receive payment "in proportion to their respective losses, and for that purpose the freighters and owners of the property, and the owner of the vessel, or any of them, may take the appropriate proceedings in any court for the purpose of apportioning the sum for which the owner of the vessel may be liable among the parties entitled thereto." In section 4285 [U. S. Comp. St. 1901, p. 2944] Congress has declared that it shall be a sufficient compliance with the requirements for limiting liability if the owner "shall transfer his interest in such vessel and freight, for the benefit of such claimants, to a trustee, to be appointed by any court of competent jurisdiction, to act as such trustee for the person who may prove to be legally entitled thereto; from and after which transfer all claims and proceedings against the owner shall cease."

General admiralty rule 54, providing for the filing of a petition to limit liability and for the ascertainment of values by appraisement, says:

"And thereupon said court, having caused due appraisement to be had of the amount or value of the interest of said owner or owners, respectively, in such ship or vessel and her freight for the voyage, shall make an order for the payment of the same into court, or for the giving of a stipulation, with sureties, for the payment thereof into court whenever the same shall be ordered; or, if the said owner or owners shall so elect, the said court shall, without such appraisement, make an order for the transfer by him or them of his or their interest in such vessel and freight to a trustee to be appointed by the court."

Though statutes in derogation of the common law must be construed strictly, the limitation applies only to the ascertainment of the lawmakers' intent, which, when found and measured, should be effectuated as thoroughly as in remedial legislation. Looking alone to the sections quoted, it seems unquestionable that Congress gave the unoffending owner of an offending vessel the absolute right to relieve himself of personal liability by turning over the vessel and her freight, for the benefit of claimants, to a trustee to be appointed by any court of competent jurisdiction. To treat rule 54 as being in pari materia for determining the nature and extent of the right is impermissible; for, though sections of a statute may color or limit what else might be deemed the meaning of other sections of the same statute, a rule of court can only be taken properly as aiding the exercise of the right, not as derogating from the right itself. In this view the rule affords the unoffending owner who might be greatly damaged by his inability to fulfill existing contracts for future service a means of exercising the right by surrendering the vessel virtually and then buying her in at a price that is fair to claimants. Undoubtedly, if the "due appraisement" of the rule were had and accepted by the owner, and if the court should thereupon order payment into the registry or the giving of a stipulation, the owner would be bound by that method of surrender and its consequences. Whether the owner, after an order for payment or stipulation has been entered upon an appraisement which he has not accepted, may or may not have the right to transfer the vessel to a trustee for public sale, is a question to which this record does not necessitate an answer. Here the court made no such order. The supplemental petition and the amendment to the petition apprised the court that the owner was dissatisfied with and purposed to withdraw from the method of surrender through appraisement. By granting leave to file these and by acting thereon, the court recognized the owner's right, before the appraisement was accepted by him or acted upon by the court, to dismiss that part of his petition which asked for an appraisement and to substitute therefor the method of transfer to a trustee. Of a petitioner's right to dismiss before any order is made on an unaccepted appraisement we have no doubt.

The owner's attitude was manifested promptly. Delay beyond the fall of 1903 seems to have been due wholly to the attempt of the claimants to hold the owner to the payment of the amount of the appraisement. Further, in the spring of 1904, the vessel remained unchanged in condition. She lay untouched from the termination of the voyage until the sale. Higher insurance rates, greater cost of operation, and

poor business were not the fault of the owner and did not alter the vessel's structural worth.

2. On the appeal of the Davidson Company the inquiry will be limited to the conduct of the Sacramento; for, if it were true that she was responsible for only half the damages, her owner ought not to be heard to complain of a decree which limits his liability to less than a third.

The Detroit River Lighthouse is half a mile south of the Red Gas buoy which marks the east side of the south end of the river channel. The night was clear, and no condition of sea or weather interfered with safe navigation. The Gladstone was coming down the river at a speed of 6½ to 7 miles an hour. The Sacramento, following the Flower at a distance of about one mile, was proceeding westwardly on the lake towards the lighthouse at a speed of 9 to 9½ miles per hour. The Flower turned north and passed the Gladstone opposite the gas buoy under starboard to starboard signals. The claim of the Gladstone is that immediately after passing the Flower she signaled the Sacramento to pass port to port; that, not receiving a prompt answer, she repeated the signal, when the vessels were about three-quarters of a mile apart, whereupon the Sacramento promptly signaled her acceptance; that the Gladstone's course was laid well over to the westward, leaving ample room in which the Sacramento might turn; that the Sacramento, with the vessels in plain sight of each other, with unabated speed, and without signaling, continued her course directly towards the lighthouse, at right angles with the Gladstone's course, until the vessels were within 900 feet, within 3 lengths, within 40 seconds of each other, when she reversed her engines and tried to swing under a port helm, while the Gladstone increased her speed and hard ported her helm in the endeavor to swing out of the channel as the only possible chance of escape, the result being that the Gladstone was struck a glancing blow on the port side. Our examination of the evidence confirms the correctness of the court's adoption of the Gladstone's account. And the very explanation of the Sacramento that, because the Gladstone and the Flower had passed starboard to starboard, she continued her course without signaling, assuming that the Gladstone would not give a port to port signal, that she did not hear the first signal if it was given, that the second signal was not sounded until the vessels were within three lengths of each other, and that then she could do nothing but accept the proffered passing arrangement, we regard as a substantial confession of most palpable negligence.

The decree is affirmed.